[No. B194139. Second Dist., Div. Seven. Jan. 16, 2007.]

KEVIN ALVARADO, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Michael P. Judge, Public Defender, Albert J. Menaster, Lesley Gordon and Mark G. Harvis, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Steve Cooley, District Attorney, William Woods and Tracey Lopez, Deputy District Attorneys, for Real Party in Interest.

**OPINION**

**JOHNSON, J.**—Petitioner seeks an order directing the trial court to grant his motion to dismiss an enhancement allegation he "used" a firearm in the commission of a burglary. He agrees the evidence produced at the preliminary hearing showed he was armed during the offense. However, he claims the evidence was insufficient as a matter of law to show he had used the firearm within the meaning of Penal Code section 12022.5, subdivision (a). Accordingly, petitioner seeks extraordinary relief to prohibit a trial on the firearm use allegation. We agree the evidence adduced at the preliminary hearing failed to show any conduct by petitioner to suggest he employed the firearm as an aid to commit the offense. We further agree the evidence of passive exposure of the firearm is insufficient to elevate his activity from mere "arming" to "use." Accordingly, we will issue the writ as prayed directing the trial court to grant petitioner's motion to dismiss the Penal Code section 12022.5, subdivision (a) firearm use enhancement allegation attached to the burglary charge.

## FACTS AND PROCEEDINGS BELOW

The evidence presented at the preliminary hearing was as follows: On May 27, 2006, Elvis Alvarado (no relation to petitioner) was working as a clerk in a minimart of a Texaco gas station in Azusa. Petitioner, Kevin Alvarado, was a regular customer at the minimart and Alvarado knew petitioner well.

On May 27th petitioner was in the minimart three times. Petitioner came in the first time around 2:30 p.m. with a friend and stayed for nearly an hour talking with Alvarado. An hour and a half later petitioner and his friend returned to the minimart. Petitioner's friend purchased some beer and the men visited with Alvarado for another 30 minutes or so before leaving.

Petitioner went to the minimart again shortly after 7:00 p.m. Alvarado did not see petitioner enter the store. Alvarado was then in the back of the store stocking the cooler. The front door of the store had no bell so Alvarado did not know anyone had entered until he heard the beer cooler door closing. Alvarado came to the front of the store and saw petitioner standing near the beer cooler drinking a beer he held in his hand.

Alvarado thought petitioner looked nervous. Alvarado asked petitioner "what was going on?" Petitioner did not respond. Alvarado saw some young men outside and asked petitioner if someone had been chasing him. Again,

petitioner did not respond. After a moment petitioner told Alvarado, "I want you to call the police and stand outside of the door." Alvarado did not take petitioner's request seriously. Petitioner again asked Alvarado to call the police. Petitioner told Alvarado, "Don't worry about it. I'm not going to hurt you. Just stay outside, because it's going to get nasty right now when the police come, between me and the police."

Alvarado thought petitioner's comments were completely out of character for the person he knew. Alvarado did not believe petitioner and thought he was just joking or playing around. Alvarado kept asking petitioner, "Are you serious?"

Alvarado finally called police from inside the store. He then noticed a gun lying on top of a rack of candy approximately a foot away from where petitioner stood. The gun was approximately 18 inches long and was later identified as a Mossburg 18-gauge shotgun. From the way it lay on the rack the gun barrel was pointed in the general direction of the glass wall. Alvarado asked petitioner whether it was a BB gun. Petitioner shook his head, "No." Petitioner told Alvarado not to worry, "I'm not going to hurt you. You're a cool guy. But I'm on a suicide mission."

Petitioner opened another beer and lit a cigarette. He told Alvarado to call the police again. At that moment two customers approached the store. Petitioner told Alvarado to go outside and keep the customers from entering the store. Petitioner said it would be best if Alvarado stayed outside as well.

Alvarado went outside to warn the customers off but came back inside to try to talk petitioner out of his plan. Eventually, Alvarado went back outside and called police on his cell phone. He told the 911 dispatcher there was a man inside the store with a gun. The dispatcher informed Alvarado police units were already on the scene. Alvarado turned around and saw a police cruiser at the intersection.

Alvarado testified he never saw the gun in petitioner's hand. He saw petitioner rest his hand on the gun, and/or on the counter over the gun. However, Alvarado testified he never saw petitioner pick the gun up and he never saw petitioner point the gun. Petitioner never demanded anything more from Alvarado than to call the police.

Officer Rocky Wenrick spoke with petitioner from outside the store on a cell phone which belonged to petitioner's brother. Petitioner told the officer "people were fucking with him," he was on a suicide mission, he was "tired of life and wanted to end it now." The officer asked petitioner several times to come out of the store. Petitioner responded he wanted to drink his beer while

he decided what to do. Petitioner asked to speak with a police officer inside the store. Officer Wenrick told petitioner "that wouldn't happen." Petitioner next asked to speak with a person he trusted at the Pacific Clinics.

After about five minutes of conversation, petitioner came out of the store unarmed. Another officer recovered the shotgun from the top of a potato chip/candy rack.

Petitioner waived his rights and agreed to speak with the officers at the police station. Petitioner explained the shotgun belonged to his father. His father usually kept the shotgun in a locker at his business located 100 yards or so away from the Texaco minimart. Petitioner said his plan was to commit "suicide by cop." He intended to wait behind the chip rack with the gun's muzzle facing the general direction of the front door. When the first police officer entered the store he was going to shoot and kill the officer. Knowing the police response would be deadly there would be a good chance he would be killed.

At the conclusion of the preliminary hearing petitioner moved to dismiss the allegation of personal use of a firearm under Penal Code section 12022.5, subdivision (a) attached to the burglary count.[1] He conceded the evidence showed he was armed. However, he argued there was no evidence to show any "action other than being in possession of a gun at the time to constitute use, rather than possession." He argued if the intention of the burglary was to shoot a police officer, and no officer even saw the gun, then there was no evidence he used the gun to facilitate the burglary.

The magistrate held petitioner to answer on all charges, as well as on the section 12022.5, subdivision (a) enhancement allegation.

Petitioner was charged in a three-count information with second degree burglary,[2] with carrying an unregistered, loaded firearm,[3] and with unlawfully carrying a loaded firearm with the intent to commit a felony, namely murder.[4] The information further alleged petitioner personally used a firearm in the commission of the burglary.[5]

In the superior court petitioner again moved to dismiss the firearm use enhancement allegation for lack of evidence under section 995. The court denied the motion. The court reasoned whether the evidence showed personal

---

[1] All further statutory references are to the Penal Code.
[2] Section 459.
[3] Section 12031, subdivision (a)(1).
[4] Section 12023.
[5] Section 12022.5, subdivision (a).

use of a firearm was a factual determination, and the court declined to substitute its judgment for the magistrate's who had the opportunity to hear and observe the witnesses during their testimony.

Petitioner filed a petition for extraordinary relief in this court. We issued an order directing respondent superior court to show cause before this court why it should not be compelled to vacate its order denying petitioner's motion to dismiss the enhancement allegation for personal use of a firearm and to issue a new and different order granting the motion. The People filed their return to the petition on November 13, 2006, and petitioner filed his traverse to the People's return on November 26, 2006.

## DISCUSSION

### I. *STANDARD OF REVIEW OF A RULING DENYING A MOTION TO DISMISS UNDER SECTION 995.*

In this proceeding we are not reviewing the sufficiency of the evidence to support a jury finding of the truth of the gun use enhancement allegation. Instead, our only task is to determine whether there is sufficient evidence in the preliminary hearing transcript to permit the district attorney to take the allegation to trial.

In *People v. Laiwa*[6] our Supreme Court explained both the standard of review of a decision on a section 995 motion and the relevant roles of the superior and appellate courts in reviewing such a decision. "[I]n proceedings under section 995 it is the magistrate who is the finder of fact; the superior court has none of the foregoing powers, and sits merely as a reviewing court; it must draw every legitimate inference in favor of the information, and cannot substitute its judgment as to the credibility or weight of the evidence for that of the magistrate. [Citation.] On review by appeal or writ, moreover, the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate holding the defendant to answer. [Citations.]"[7]

A magistrate conducting a preliminary examination "must be convinced of only such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused. [Citations.]"[8] If there is some evidence to support the

---

[6] *People v. Laiwa* (1983) 34 Cal.3d 711 [195 Cal.Rptr. 503, 669 P.2d 1278].

[7] *People v. Laiwa, supra,* 34 Cal.3d 711, 718.

[8] *Taylor v. Superior Court* (1970) 3 Cal.3d 578, 582 [91 Cal.Rptr. 275, 477 P.2d 131].

magistrate's order, the reviewing court will not inquire into its sufficiency.[9] "Thus, an indictment or information should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged. [Citations.]"[10]

We review the evidence in support of the information "to determine whether as a matter of law it is sufficient, not whether the trial court's ruling was reasonable. (*People* v. *Laiwa, supra,* 34 Cal.3d 711, 718; *People* v. *Superior Court (Grilli)* ' (1978) 84 Cal.App.3d 506, 511 [148 Cal.Rptr. 740].)"[11]

## II.   *THE EVIDENCE IN THE PRELIMINARY HEARING TRANSCRIPT IS INSUFFICIENT AS A MATTER OF LAW TO WARRANT A TRIAL ON THE ALLEGATION OF PERSONAL USE OF A FIREARM.*

■   Section 12022.5, subdivision (a) provides in pertinent part: "[A]ny person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense." By contrast, section 12022 specifies punishment for being armed during the commission or attempted commission of a felony is, except in certain circumstances, limited to a consecutive term of imprisonment in state prison for one year.[12] "In these two statutes, the Legislature drew a distinction between being *armed* with a firearm in the commission of a felony and *using* a firearm in the commission of a felony, and it made firearm *use* subject to more severe penalties."[13]

The Penal Code provides definitions to distinguish between arming and use. Section 1203.06 currently states " 'used a firearm' means to display a firearm in a menacing manner, to intentionally fire it, . . . or to use it in any manner that qualifies under Section 12022.5."[14] This section defines "armed

---

[9] *Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197].

[10] *People v. Superior Court (Jurado)* (1992) 4 Cal.App.4th 1217, 1226 [6 Cal.Rptr.2d 242].

[11] *People v. Superior Court (Jurado), supra,* 4 Cal.App.4th 1217, 1226.

[12] Section 12022, subdivision (a)(1).

[13] *People v. Bland* (1995) 10 Cal.4th 991, 996–997 [43 Cal.Rptr.2d 77, 898 P.2d 391].

[14] Section 1203.06, subdivision (b)(2). (Stats. 2006, ch. 337, § 42, eff. Sept. 20, 2006.) CALJIC No. 17.19 adopts the statutory definition for "use of a firearm," as does Judicial Council of California Criminal Jury Instructions (2006) CALCRIM No. 3146. (See also, *People v. Wims* (1995) 10 Cal.4th 293, 302 [41 Cal.Rptr.2d 241, 895 P.2d 77] [noting the definition in the standard jury instruction for "use" was adapted from the statutory definition]; *People v. Johnson* (1995) 38 Cal.App.4th 1315, 1319 [45 Cal.Rptr.2d 602] [declaring the statutory definition of gun use in § 1203.06 applicable to § 12022.5].)

with a firearm" as "to knowingly carry or have available for use a firearm as a means of offense or defense."[15]

■ "In *People* v. *Chambers* (1972) 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024], [the Supreme Court] explained the distinction between *use* and *arming* this way: 'By employing the term "uses" instead of "while armed" the Legislature requires something more than merely being armed. (*People* v. *Washington* (1971) 17 Cal.App.3d 470, 474 [94 Cal.Rptr. 882].) One who is armed with a concealed weapon may have the potential to harm or threaten harm to the victim and those who might attempt to interrupt the commission of the crime or effect an arrest. (See *People* v. *Pheaster* (1963) 215 Cal.App.2d 754 [30 Cal.Rptr. 363].) Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies. "Use" means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage." (Webster's New Internat. Dict. (3d ed. 1961).)' [The Supreme Court] concluded in *Chambers* (7 Cal.3d at pp. 672–673) that the defendant, who had demanded money from the victim at gunpoint, *used* the gun 'at least as an aid' in the commission of the completed crime of robbery.

"In contrast, *arming* under the sentence enhancement statutes does not require that a defendant utilize a firearm or even carry one on the body. A defendant is *armed* if the defendant has the specified weapon available for use, either offensively or defensively. (*People* v. *Reaves* [(1974)] 42 Cal.App.3d 852, 856–857 [117 Cal.Rptr. 163]; *People* v. *Superior Court* (*Pomilia*) (1991) 235 Cal.App.3d 1464, 1472 [1 Cal.Rptr.2d 386]; see CALJIC No. 17.15 ['The term "armed with a firearm" means knowingly to carry a firearm or have it available as a means of offense or defense'].) As a recent Court of Appeal decision observed, 'a firearm that is available for use as a weapon creates the very real danger it will be used.' (*People* v. *Mendival* (1992) 2 Cal.App.4th 562, 573 [3 Cal.Rptr.2d 566].) Therefore, '[i]t is the availability—the ready access—of the weapon that constitutes arming.' (*Id.* at p. 574.)"[16]

---

[15] Section 1203.06, subdivision (b)(3) (Stats. 2006, ch. 337, § 42, eff. Sept. 20, 2006).

[16] *People v. Bland, supra,* 10 Cal.4th 991, 996–997; accord, *In re Tameka C.* (2000) 22 Cal.4th 190, 197 [91 Cal.Rptr.2d 730, 990 P.2d 603] ("We have said that a firearm-use allegation may be established as true if the defendant 'utilized the gun at least as an aid in completing an essential element of the [underlying] crime . . . . ' (Citation.)").

■ Whether a gun is "used" in the commission of an offense—"at least as an aid"—is broadly construed within the factual context of each case.[17] There are no precise formulas, or particular fact patterns to follow, to determine whether a gun has been "used" for purposes of a sentence enhancement.

Some Courts of Appeal have analyzed fact patterns and presented a recapitulation of the facts in those cases finding "use." The decision in *People v. Hays*[18] is one such example. In *Hays*, the bookkeeper of a Sav-On drugstore was startled when a man crashed through the acoustical ceiling of her office which contained the store's safes. The man had a rifle slung across his chest. The bookkeeper felt threatened and afraid. She screamed, ran out of her office and down the stairs. She reported there was a man upstairs with a gun and another employee went upstairs to sneak a look at the robber.[19] The question before the Court of Appeal was not whether the defendant was armed, as he surely was, but whether he personally "used" the rifle in the commission of the robbery "as required by section 12022.5 before the extra penalty may be imposed?"[20] The *Hays* court reviewed numerous cases and found in each of the cases upholding a gun use enhancement the defendant had either aimed, cocked, fired the gun, or displayed the gun in a menacing manner accompanied by words threatening a more violent use.[21]

The court concluded Hays's acts were "factually akin to the 'armed' cases rather than the 'use' cases. During the robbery Hays did not shoot or strike anyone with the rifle nor did he threaten to do so. Rather, he passively displayed the weapon. It hung across his chest as he came down into the office and was slung over his shoulder once he landed. The fact Pederson was frightened by his rifle does not compel a conclusion Hays used it. *People v. Nelums* (1982) 31 Cal.3d 355, 360 [182 Cal.Rptr. 515, 644 P.2d 201], upheld an 'armed with' finding (§ 12022, subd. (a)) with respect to an inoperable weapon. The California Supreme Court reasoned: even a passive display of a firearm may engender a response in the victim but the fear of a potential use does not escalate an 'armed with' status to a 'use' punished by section 12022.5. Pederson too was frightened by the gun's presence, its potential for use. However, under *People v. Chambers, supra,* 7 Cal.3d 666, 672, a bare potential for use will not support a use enhancement under section 12022.5.

---

[17] *People v. Chambers, supra,* 7 Cal.3d at page 672.
[18] *People v. Hays* (1983) 147 Cal.App.3d 534 [195 Cal.Rptr. 252].
[19] *People v. Hays, supra,* 147 Cal.App.3d 534, 538–539.
[20] *People v. Hays, supra,* 147 Cal.App.3d 534, 544.
[21] *People v. Hays, supra,* 147 Cal.App.3d 534, 548.

We conclude Hays was 'armed with' the rifle during the robbery but there is no evidence to support a finding of 'use.' To hold otherwise would eliminate the distinction between 'armed' and 'use,' a distinction the Legislature clearly intended to make. . . ."[22]

The court in *People v. Granado*[23] also reviewed numerous cases upholding gun use enhancements and rejected the defendant's argument the rule of *Hays* and other cases was display of a gun without a verbal threat was not "use" warranting an enhancement under section 12022.5, subdivision (a). In *Granado* the defendant took a gun from his waistband while standing within a few feet of one of his would-be victims and displayed the gun while demanding money.[24] The second victim ran away just as or after the defendant drew his gun and was chased by the defendant's machete-wielding cohort. The defendant argued the general rule gleaned from previous cases was display of the gun alone was insufficient unless the gun was pointed at a person or fired, or the display was accompanied by verbal threats.

The *Granado* court rejected the notion there was any rigid rule of law regarding "use" which applied to new or different fact patterns. The court observed the *Hays* court did not purport to state any specific rule but merely reviewed the fact patterns of then-existing case law on the subject. Indeed, the holding of the *Hays* court, the *Granado* court observed, concerned an entirely different principle, namely, a gun "use" finding is precluded if the defendant's conduct with respect to the weapon is merely a passive or inadvertent exposure of the gun.[25] "In *Hays* the evidence was insufficient because, even though the gun was exposed to the victim's view, the exposure was not an act in furtherance of the crime, but a mere incident of possession."[26]

The *Granado* court articulated a rule requiring "gun-related *conduct* coupled with facilitative *intent*" to distinguish "use from mere possession."[27] "The litmus test for the distinction is functional: Did the defendant take some *action* with the gun *in furtherance of the commission* of the crime? If so, the gun was 'used,' and the more severe penalty of section 12022.5(a) applies. If, on the other hand, the defendant engaged in no weapons-related conduct, or such conduct was incidental and unrelated to the offense, no 'use' occurred, and only the lesser enhancement of section 12022(a) applies."[28] "Thus when

---

[22] *People v. Hays, supra,* 147 Cal.App.3d 534, 548–549.

[23] *People v. Granado* (1996) 49 Cal.App.4th 317 [56 Cal.Rptr.2d 636].

[24] *People v. Granado, supra,* 49 Cal.App.4th 317, 321–322.

[25] *People v. Granado, supra,* 49 Cal.App.4th 317, 324–325.

[26] *People v. Granado, supra,* 49 Cal.App.4th 317, 324.

[27] *People v. Granado, supra,* 49 Cal.App.4th 317, 329.

[28] *People v. Granado, supra,* 49 Cal.App.4th 317, 324–325, footnote 7.

a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure."[29]

The *Granado* court concluded the evidence was sufficient in that case to sustain the jury's finding of gun use. "Even if Wilfredo did not notice the gun, it was deployed to control the conduct of both victims. At the very least, it 'effectively glued' Walter to his location (*People v. Johnson, supra*, 38 Cal.App.4th 1315, 1321), prevented him from going to Wilfredo's assistance, and thereby aided defendant's machete-wielding partner in the ongoing attempt to rob Wilfredo."[30]

Based on these decisions, the People correctly point out, a "use" finding does not necessarily require a defendant to point the gun at his victims. In *People v. Johnson*[31] it was sufficient for a "use" finding the defendant moved the gun from his pants to his hand and pointed it in his wife's direction, if not actually at her.[32] However, the defendant's display of the gun in *Johnson* was also accompanied by threats. He repeatedly told his wife the entire family would be better off dead if they could not be together and he threatened to kill her. The defendant's words while holding the gun in his hand convinced his wife he was going to shoot her and kept her "effectively glued" and captive.[33]

It is also true, as the People argue, a "use" finding does not require the victim to see the gun to constitute a facilitative "use." In *People v. Jacobs*[34] the defendant's words, " 'I have a gun and I don't want to use it' " followed by audibly cocking the gun in his pocket constituted "use" for a gun use enhancement under section 12022.5, subdivision (a). The question in the case was whether the defendant's conduct amounted to a menacing "display" of the gun. The court concluded it was, stating "a firearm is displayed when, by sensory perception, the victim is made aware of its presence."[35]

Nor need a defendant touch the gun for a "use" finding under section 12022.5, subdivision (a). For example, in *People v. Colligan*[36] the defendant

---

[29] *People v. Granado, supra*, 49 Cal.App.4th 317, 325.

[30] *People v. Granado, supra*, 49 Cal.App.4th 330.

[31] *People v. Johnson, supra*, 38 Cal.App.4th 1315.

[32] *People v. Johnson, supra*, 38 Cal.App.4th 1315, 1318.

[33] *People v. Johnson, supra*, 38 Cal.App.4th 1315, 1318, 1321.

[34] *People v. Jacobs* (1987) 193 Cal.App.3d 375, 379 [238 Cal.Rptr. 278].

[35] *People v. Jacobs, supra*, 193 Cal.App.3d 375, 381.

[36] *People v. Colligan* (1979) 91 Cal.App.3d 846 [154 Cal.Rptr. 389].

opened his shirt so the victim could see the handle of the gun he had in his waistband. The defendant then told the victim he had a gun but did not want to use it. In the court's view, "[t]he clear implication of the remark that he didn't want to use it [the gun] was that he would use it if Holmes did not cooperate; it caused her to be frightened for her life and safety and to comply with his demands. It would be fatuous to conclude under these circumstances that the gun was not 'used' in the commission of the robbery."[37]

Each of these decisions is nevertheless consistent with the observation of *Granado*, on which the People rely, that a gun is "used" when there is evidence of gun-related *conduct* coupled with the intent the gun-related action *facilitate the crime*: in *Johnson* active display with threats to effect the false imprisonment, in *Jacobs* a threat and audibly cocking the gun as if in preparation to shoot to complete the robbery, in *Colligan* active display with threats to further the robbery.

In the present case, by contrast, there was no evidence of any conduct or action with regard to the shotgun. Petitioner did not shoot the gun. He did not strike anyone with the gun. He did not point the gun at anyone. He did not brandish or even display the gun in a menacing manner. Petitioner apparently rested his hand over the gun at some point. However, no witness or potential victim testified he or she saw petitioner hold or pick up the gun, or even draw attention to its presence. The gun was already out of petitioner's hands and lying on the candy rack when Alvarado came into the front of the store. It apparently remained in that position until retrieved by police department personnel after petitioner's arrest. Petitioner left the store unarmed and a police officer later found the gun still lying on the candy rack.

Petitioner did not threaten Alvarado with the gun or otherwise. The only thing petitioner asked Alvarado to do was to call the police.

As in *Hays*, petitioner's acts indisputably showed he was "armed." However, the transcript of the preliminary hearing contains no evidence of gun-related *conduct* beyond passive exposure of the gun. There is no evidence to suggest, or from which to infer, he employed the gun "at least as an aid" in the commission of the burglary.[38] In these circumstances the personal use of a firearm enhancement allegation cannot stand.

The People dispute this conclusion. They argue petitioner intentionally displayed the shotgun for the purpose of causing Alvarado to call the police

---

[37] *People v. Colligan, supra*, 91 Cal.App.3d 846, 851.
[38] *People v. Chambers, supra*, 7 Cal.3d 666, 672.

to further his plan to commit "suicide by cop." The record does not support the People's argument. First, there is nothing in the record to suggest petitioner placed the gun on the candy rack for any reason other than convenience. At 18 inches, the shotgun was likely too long to keep in his pocket. More importantly, however, the gun's presence had no effect on Alvarado's decision to call the police. Alvarado testified he called the police before he even saw the gun. Alvarado also testified the police dispatcher informed him officers were already at the scene in response to his initial call by the time Alvarado made his second call to report there was a "man inside the store with a gun." Thus, petitioner's plan to induce law enforcement officers to come to the scene was already accomplished before anyone was even aware of the gun's presence.

The People alternatively propose the gun furthered the commission of the crime because, despite petitioner's assurances he did not want to and would not harm Alvarado, its presence constituted an implied threat Alvarado could be harmed if he refused to telephone the police. Again, as noted, Alvarado called the police even before he became aware of the gun's presence. Moreover, the evil described by the People is the quintessential type of risk inherent in being *armed* with a firearm—its availability and potential for use. But absent evidence of some type of conduct or action with the gun its potential for use is insufficient alone to support a finding of "use."[39] As the *Hays* court put it, "To hold otherwise would eliminate the distinction between 'armed' and 'use,' a distinction the Legislature clearly intended to make."[40]

■ In sum, the evidence was more than sufficient to show petitioner was armed with the shotgun. The evidence was also sufficient to show that when he entered the minimart petitioner *intended* to use the firearm to trigger a lethal response and commit "suicide by cop," but did not have the opportunity.[41] Petitioner presumably does not challenge the sufficiency of the evidence to hold him to answer on the burglary charge for this reason. However, because there was no evidence of any *action* taken with the gun, or of any gun-related *conduct* at all, we conclude the evidence is insufficient to hold petitioner to answer on the personal use of a firearm enhancement allegation. Accordingly, we will issue the writ as prayed.

---

[39] *People v. Chambers, supra,* 7 Cal.3d 666, 672 [fear of a potential use is not the equivalent of use].

[40] *People v. Hays, supra,* 147 Cal.App.3d 534, 549.

[41] See *People v. Pheaster, supra,* 215 Cal.App.2d at page 760.

## DISPOSITION

Let a peremptory writ of prohibition issue directing respondent superior court to vacate and set aside its ruling denying the motion to dismiss the Penal Code section 12022.5, subdivision (a) enhancement allegation and to enter a new and different order granting the motion to dismiss the enhancement allegation.

Perluss, P. J., and Zelon, J., concurred.